## J. M. GUFFEY PETROLEUM CO. v. COASTWISE TRANSPORTATION CO.

## COASTWISE TRANSPORTATION CO. v. J. M. GUFFEY PETROLEUM CO.

(District Court, S. D. New York.    December 8, 1908.)

SHIPPING (§ 56*)—BREACH OF CHARTER—LIABILITIES.

The schooner William L. Douglas was chartered by the Coastwise Transportation Company to the Unique Shipping Company and the charter assigned by the latter to the J. M. Guffey Company. The fittings for carrying oil in bulk were to be furnished by the Shipping Company. *Held* that the proper fittings were not furnished by the charterer and that it was liable for the loss resulting from the vessel being taken from the Guffey Company by the owner.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 126; Dec. Dig. § 56.*]

(Syllabus by the Judge.)

Wing, Putnam & Burlingham, for the Guffey Company.

Blodgett, Jones & Burnham and J. Parker Kirlin, for the Coastwise Company.

ADAMS, District Judge. The first of the above entitled actions was brought by the J. M. Guffey Company to recover from the Coastwise Transportation Company the damages, said to amount to $80,000, caused by an alleged breach of charter of the schooner William L. Douglas, owned by the Coastwise Company, on August 23, 1907, in withdrawing the vessel from the service of the libellant. The cross action is to recover the damages caused the Coastwise Company by an alleged breach of the contract in refusing to continue the employment of the vessel and pay charter hire, amounting, it is alleged, to $100,-000.

The charter in question was as follows:

"New York, May 16th. 1906.

It is this day mutually agreed between the Coastwise Transportation Company, a corporation organized under the laws of the State of New Jersey, Owner of the Schooner 'William L. Douglas,' of about 3470 tons net register, hereinafter called Owner, and the Unique Shipping Company, a corporation organized under the laws of the state of New Jersey, hereinafter called Charterer:

That the said Owner agrees to let and said Charterer agrees to hire the said schooner for the term of six months, commencing at noon on April 30th. Upon the expiration of the Charter the vessel is to be re-delivered by the Charterer (unless lost) at New York.

The vessel is to be employed in carrying bulk oil from Port Arthur, Texas, or Sabine Pass, Texas, or any other safe port in the Gulf of Mexico, to New York, Philadelphia, Boston, or Baltimore, as Charterer may elect. Charterer is to fit out the vessel with wooden bulkheads so as to enable her to carry the cargo, and make any other alterations necessary to fit the vessel for the trade.

The Charterer is allowed to use the piping now in the vessel for loading and discharging cargo with the understanding that additions must be made to it at Charterer's expense. Charterer may use the two ballast pumps now in the vessel for pumping oil, but must fit them for this purpose and leave them in as good condition as when vessel was delivered, all ordinary wear and tear excepted.

The Owner is to provide and pay for all provisions, wages, shipping and dis-- charging fees of the captain and crew, pay for the insurance of the vessel, also all cabin, deck, engine-room and other necessary stores, and maintain her in a thoroughly efficient state (with the exception of the cargo arrangements) during the service.

The Charterer is to provide and pay for all coal, water, oil, port charges, pilotages and towages.

The vessel is intended to be towed by a steamship or tugboat, Charterer supplying necessary hawser, Charterer has privilege to use as much of the vessel's chains as he desires as a spring for the hawser. The chain to be made fast in the same manner as when the vessel is at anchor.

The Charterer shall pay for the use and hire of the said vessel Five thousand ($5,000.00) dollars per calendar month, commencing from the day of her delivery as aforesaid, and to continue until her redelivery to the Owner (unless lost). Payment of the said hire to be made in cash, in New York, at the end of each month, and in default of such payment or payments as herein specified, the Owner has the privilege of withdrawing the said vessel from the service of the Charterer.

The Owner agrees to remove the topmasts, all unnecessary sails and all other weight which can be dispensed with, Charterer to pay Three hundred ($300.00) dollars for this work. It is understood that the Owner need not carry as large a crew as when the vessel is sailing, but he agrees to carry whatever engineer crew is required to properly handle the cargo. Cargo to be loaded and discharged day and night.

The captain shall hoist sails whenever they can be used to advantage and render all possible assistance to the Charterer. If the Charterer shall have reason to be dissatisfied with the conduct of the captain, officers or crew the Owner shall, on receiving particulars of the complaint, promptly investigate the same and if necessary, make a change in the appointments.

The Charterer has permission to appoint a super cargo if desired. He is to be furnished, free of charge, with cabin fare and accommodations.

In the event of loss of time from deficiency of men or stores, breakdowns, stranding, fire, or damage, preventing the working of the vessel for more than 24 running hours the payment of hire shall cease until she be again in efficient state to resume her service, but if the loss of time is due to breakdown of pumps or other oil fittings, or vessel should go aground in harbor or rivers, through no fault of the vessel, the loss of time shall be at Charterer's expense. Should the vessel be driven into port or to anchor by stress of weather, said loss of time shall be at Charterer's risk and expense.

At the expiration of six months the Charterer shall have the privilege of renewing this charter for the period of four years, all the terms and conditions to be the same except that the Charterer shall have the right to terminate said charter at any time upon giving thirty days notice of its intention so to do.

When the charter has expired, the Charterer agrees to remove all bulkheads, piping, and other things he has added to the vessel, and properly clean the holds before re-delivering her.

The acts of God, fire, all dangers and accidents of seas, throughout this Charter Party, to be always mutually excepted.

The Owner shall have a lien upon the cargo and all sub-freights for any amounts due under this Charter.

The Charterer has the option of carrying general cargo in either direction if he so desires. It is understood that the vessel may be loaded to 26 feet draught, but not deeper. Owner states that as now rigged she carries 6000 tons of coal on this draught.

This Charter Party is to take the place of the Charter Party dated April 14th, 1906, between the Coastwise Transportation Company and F. H. Weeks, Agent.

This Charter Party shall be binding upon the Coastwise Transportation Company, its successors and assigns and upon the Unique Shipping Company, its successors and assigns.                    Unique Shipping Co.
     [Seal]                              by F. H. Weeks, President.
  Attest I. W. Millard, Secretary        Coastwise Transportation Co.
     [Seal]                              J. G. Crowley, Gen. Mag.

The charter was to continue in force until August 30, 1910, subject to a right on the part of the charterer to cancel at any time, upon giving 30 days' notice to the owner. The contract was assigned by the Unique Shipping Company to H. A. Phillips and by him to the Guffey Company.

On August 23, 1907, the Guffey Company had the privilege of continuing the use of the vessel for about two months over three years and it is upon such claim and one for the value of the fittings placed in the Douglas by the libellant, or its assignors, said to amount to $30,000, that the Guffey Company's demands for damages are based. The Coastwise Company's claim for damages is based upon the Guffey Company's breaches of the charter.

The original charter of the vessel was not with the Guffey Company directly but that Company had the benefit of it and was using the vessel for its purposes.

The Douglas was a six masted schooner, all of steel, excepting her top masts, booms and gaffs. She was 266 feet long, on the water line, 48 feet wide and had 30 feet depth of hold. When built she had a collision bulkhead forward and one aft, and in her center a deep tank, for carrying ballast, with a bulkhead at each end of it, and a center line bulkhead through her. She was built in Quincy, Massachusetts, and at first used for carrying coal and had a twenty year A1. rating. This rating she subsequently lost through the defective oil carrying arrangements which were placed in the vessel.

Under the charter in suit, the vessel was delivered to the Unique Shipping Company, represented by F. H. Weeks, at the Morse Iron Works in Brooklyn, where wooden bulkheads were put in her and other interior arrangements made for the transportation of oil in bulk. After these fittings were installed, she proceeded to Port Arthur for a cargo of oil. Shortly after arrival there water was admitted to her through the sea valves and she was thus tested with water to ascertain the efficiency of the fittings. It was then found that the fittings were not tight but permitted the water to run from the side of the vessel into which it had entered to the other side, notwithstanding the center bulkhead, causing her to list so badly that it was necessary to pump it out in order to straighten her up; then they washed her bulkheads with a water hose, giving them a thorough wetting down, then they pumped the water out and the next day started to load the cargo of oil. The bulkheads, however, leaked quite badly, the oil running from one tank to another, all of the various new bulkheads leaking but they finally succeeded in getting her loaded and she proceeded to sea, arriving in New York in due course. Some repairs were then made on the bulkheads at the Morse dock by caulking and the use of cement and she returned to Texas for another load, which she took notwithstanding that the leaks continued, but not to the same extent as on the previous loading. The vessel was arranged with expansion tanks built over the main tanks for the purposes of feeding and keeping them full. These tanks, as well as the between decks leaked somewhat but not as badly as on the previous voyage. The vessel met with a hurricane going north in December, during

which her fittings generally leaked very badly, the expansion tanks so that they would not hold the oil but allowed it to run into the between decks, causing danger of the vessel capsizing if the pumps should for any reason cease to work. Upon reaching New York after this experience, she was taken to Shooter's Island and the fittings were again overhauled and repaired as far as possible in the limited time available. The vessel then went to sea and acted in practically the same manner as to her oil fittings. This time on her return she went to Philadelphia, and during the voyage she leaked so that upon arrival she had about a foot in depth on her between decks, notwithstanding the continual working of her pumps. It was said that the suction pipes were too small which served to account for the failure of the pumps to keep her free and larger suction pipes were put in. After that in fine weather they were able to keep the between decks free but had great difficulty in bad weather. Then the leakage came from the expansion tank and the sides of the vessel's fittings. Up to this time the vessel was not managed directly by the Guffey Company but its agent, Mr. Taber, the manager of the company's marine department, had been on hand upon her return from Texas each time and the master had talked with him about the condition of the fittings and he went aboard of the vessel and saw its interior condition. The master told him that he did not consider the vessel fit to go to sea in her condition, considering either the safety of the vessel herself or the lives of those on board. Mr. Taber recognized the situation and said to the master that if she was permitted to remain in that condition, he should refuse to load her again at Port Arthur. She was, however, loaded again at that place and took another cargo on board, notwithstanding she was in practically the same condition as before, the oil running from the tank in which it was pumped into another not then intended to be filled, in sufficient quantities to be heard plainly. The expansion tanks continued to be in a leaky condition and were filled to the depth of five feet, in conformity with orders, but the oil leaked out almost immediately.

A Mr. Foley, at one time superintendent of the marine department of the Guffey Company, but not in its employ at the time of testifying, said that he knew the Douglas and had instructions from Pittsburgh, the home of the company, in December, 1906, that she had been taken over and received directions from Mr. Taber "to get her fixed up, the bulkheads tightened and to fix her in good condition"; that he went and inspected the vessel thoroughly with the captain and found "her generally bad all over * * * several feet of oil in the between decks" and in response to a question about her expansion tank, said "she was leaking all over, just like a sieve, all over"; that he told Mr. Taber "there was no use to spend money on her, to just plug along and do the best he could."

The master testified that Mr. Foley "came down on New Year's Day and spent about all day on the ship and went all over her" and he, the master, told Mr. Foley:

"I would recommend the expansion to be fixed entirely different from what they were, that I didn't think they were so you could keep oil in them at all;

and the wooden bulkheads to be made tight or to put in steel ones—it didn't make any difference to me, only to make the ship seaworthy."

The master remained on the vessel until the 30th of June, 1907, and said that the repairs which were considered necessary were not made while he was on her, though some things, as putting in an oil pump, changing the smoke stack, putting rubber gaskets on No. 4 tank, were done, without any good effect, that "it was just as bad after it was done, if anything, worse" excepting the leak in the top of No. 4 tank was stopped. He further said that the No. 4 tank was the only one that was helped, that tank being absolutely tight as far as the top was concerned, but the other tanks were the same as before, and when loading they could hear oil running from one to the other; that the longer he was in her the "worse they got, they got so you couldn't keep oil in them at all" and the bulkheads "gradually got worse all the time"; that on her last trip the braces had fallen down and he had them hoisted out and thrown overboard. He further said that nothing was done to repair the wooden part of the vessel after the Guffey Company took charge of her. He left her on the 30th day of June and at that time did not consider her safe to carry bulk oil and said to Mr. Connolly, the New York Superintendent of the Guffey Company, that he considered her very unsafe, "in fact I didn't think she was fit to go to sea. I said if she ever goes to sea and gets in a bad gale of wind we are going to lose the vessel and drown everybody aboard," which was his judgment. He further said that he stopped going in her, for one reason, that he had a fever but "mostly on account of the condition of the ship, I didn't never intend to go back on the ship as long as she was in the condition she was in, until she was repaired and made seaworthy I wasn't going into her."

Captain McLean was succeeded in the command of the Douglas by Captain Arey, who had had a long sea experience and had master's papers. He had acted as mate of the Douglas under Captain McLean after September, 1906. He joined just after she had been through the hurricane and found her in a very dilapidated condition from the effects of that storm. She was then taken to Shooter's Island and the storm damage repaired and some work was done on the oil fittings but the leaks were not fully stopped and she leaked considerably on the ensuing trip. Arey continued as mate up to the 1st of July, 1907. He said that some cement was put in the bulkheads and that they all leaked, as did the expansion tanks. All leaks grew worse as time went along. He further testified that she continued to become worse in condition until he finally concluded that he would not care to continue on the vessel unless her condition should be so improved that she would be actually seaworthy.

Other members of the crew came to the same conclusion as the officers and I think there can be no doubt that when, on August 23, 1907, the Coastwise Company declined to continue her in the Guffey service, she could not be sent to sea without great hazard. From the first, it was found that the wooden bulkheads were not acting well and their defects increased with the passage of time, so that it was only a question as to when she would be lost in consequence of her

condition with respect to the oil fittings or be retired from service, unless they should be properly refitted with iron or steel bulkheads and the necessary appurtenances. This had been recognized for some time by the officers of the Coastwise Company, and they had persistently urged the Guffey Company to make the change, which the latter refused to do, saying that the owner had chartered the vessel to the Unique Company "as a wooden bulkhead proposition" and the Guffey Company had so taken it and would not think of replacing the wooden bulkheads with steel ones.

When the Coastwise Company was considering the question of withdrawing the vessel from the Guffey service, it called a survey upon the vessel, which resulted in the following report:

"New York, August 23rd, 1907.

Ref: 6–m. Schr: 'William L. Douglas'
3718–3470 tons, of Boston (Mass.)

This is to certify that we, the undersigned Marine Surveyors did, on this date, at the request of Capt. A. Crowley, acting for and on behalf of the Owners, attend the above named vessel while lying afloat and moored at the J. M. Guffey Co.'s Pier, Bayonne (N. J.), to ascertain and report upon her fitness to proceed to sea and continue in the service of transporting oil in bulk without risk or danger to herself.

That, after examination, the undersigned are of opinion that the wooden bulkheads and expansion trunks at present fitted in said vessel are inefficient owing to the fact that it has been found impracticable to insure oil-tightness when fitting wooden bulkheads in direct contact with the sides of a vessel of those dimensions; that the liquid cargo cannot therefore be controlled on account of the free passage it has from one compartment to another; and that, to place her in a safe and seaworthy condition, suitable steel bulkheads, expansion trunks &c., should be fitted, the deck strengthened and the vessel otherwise made oil-tight to enable her to continue in the particular trade in which she is now engaged.

In view of the foregoing, the undersigned would recommend that said Schr: 'Wm. L. Douglas' be not allowed to proceed to sea with a liquid cargo until the above recommendations have been satisfactorily carried out.

Louis L. Berwind
Chs. Niehen
H. Wilkinson
per J. J. Jones."

It will be seen that the question of the suitability of wooden bulkheads was directly presented and the board found that the vessel was not fit to go to sea with bulkheads of that material but held that steel bulkheads should be substituted, thus presenting the very subject of dispute between the parties and determining in favor of the contention of the Coastwise Company. Of course the determination is not in any way binding but while it is not so, it is somewhat persuasive, although the Guffey Company was not represented in the proceedings. It could, however, have had the matter presented to another board of survey, at which it could have had an opportunity of presenting its side of the question, if it deemed it advisable.

The question presented then is what were the obligations of the parties to the contract quoted above. It is not questioned that the Guffey people, through their connection with the matter, the Unique Company having been in effect their agents throughout, controlled the matter from the beginning.

The vessel was originally designed for and employed in carrying coal. In this contract there occurs the provision that the charterer is to employ the vessel in carrying bulk oil, and for the purpose, "is to fit out the vessel with wooden bulkheads so as to enable her to carry the cargo, and to make any other alterations to fit the vessel for the trade." It was provided also that the charterer should be allowed to use the piping already in the vessel for the trade she was to be engaged in with the understanding that additions should be made at its expense and all fitted for oil carrying but should leave them at the expiration of the contract in as good condition as when delivered, ordinary wear and tear excepted.

If the contract provided for steel instead of wooden bulkheads, taking the condition of the vessel into consideration, there can be no doubt that the attitude of the Coastwise Company would have been correct. To what extent does the fact that the contract provides that the charterer should fit the vessel with wooden bulkheads change that conclusion? It does not appear that the situation which subsequently developed was in consideration by the parties when the agreement was made. I think it may be fairly assumed that they both thought that wooden bulkheads would answer the purpose.

Mr. Weeks, called as a witness by the Coastwise Company, said that he negotiated the charter with the vessel's owners on behalf of himself and others, who subsequently became the Unique Shipping Company. This charter is the one quoted above. Mr. Weeks drew the contract, in which there were some changes made at the request of Mr. Crowley, who represented the Coastwise Company. The Unique Company, through Mr. Weeks, or under his direction, designed the wooden bulkheads. He said, on cross examination:

"Q. You in fact intended these bulkheads to be absolutely oiltight, did you not? A. I didn't expect them to be absolutely tight, no.

Q. For the purpose of carrying oil with safety it is not necessary that they should be strictly oiltight, is it? A. That is a matter of opinion. Most people say it is necessary to have them absolutely tight. I specified in my contract with the shipbuilder that he should make them absolutely tight.

Q. Did you intend when this contract was made to have them absolutely oiltight? A. Which contract?

Q. The contract you made with the Coastwise Company, both the original one and the one of May 16th? A. I intended to have them practically tight.

Q. What was meant by 'practically tight'? A. That is a pretty hard thing to tell.

Q. You did not mean to have them actually tight? A. I intended to have them so there would be very little leakage.

Q. That is, that the leakage would not be so great as to endanger the safety of the ship or to seriously impair the purpose for which she was designed? A. I didn't say that.

Q. I ask you that? A. No. I intended to have them much better than that.

Q. How tight did you intend to have them? A. I intended to have them almost absolutely tight.

Q. What do you mean by 'almost'? A. That is pretty hard to tell. Some people would say a teacupful leaking through the bulkhead would come within that definition; others would say a barrel.

Q. What did you mean? A. I didn't go into the subject with such great detail.

168 F.—25

There can be no doubt, I think, that the Unique Company was bound to put in the vessel such fittings, including bulkheads, as would enable her to carry bulk oil safely. The wooden bulkheads, while never entirely satisfactory, and always suggesting the necessity for steel ones, were kept for a time in such order that the vessel was able to carry the oil. After she was turned over formally by the Unique Company to the Guffey Company, very little was done to preserve her seaworthiness as to the fittings. The latter professed to have always been willing to make such repairs as the Coastwise Company should properly require. 'The latter was always complaining of the condition of the fittings and suggesting steel bulkheads, which the Guffey people declined to consider, but at the same time allowed the wooden fittings to decline for want of repairs, so that eventually, the vessel did become unseaworthy in the sense that she was in an unsafe condition to navigate when loaded. It seems to me that that state of affairs arose entirely through the neglect of the Guffey people. While perhaps they were not required to go to the expense of new bulkheads of steel, they were required, if they did not deem that expedient, to keep the wooden ones in better condition. The Unique Company was able to do this for a time and probably the Guffey Company could and it should have done so, or attempted to, even if increasingly expensive. The attempt to use wooden bulkheads arose from its mistake, or that of its predecessor, in which the Coastwise Company did not participate beyond acquiescing. The Guffey Company was bound to keep the vessel in condition in the respects mentioned and instead of doing so evinced a disposition to continue her use while in a dangerous condition. All the Coastwise Company asked at the end was that the vessel should be put in a safe condition and in the absence of a fulfilment of this condition by the Guffey Company, the Coastwise Company was justified in refusing to take the further risk and in withdrawing her from the service.

The libel of the Guffey Company will be dismissed and a decree entered for the Coastwise Company, with an order of reference.